# W. W. TROUP v. A. J. RICE ET AL.

1. CHANCERY.   *Practice.   Multifariousness.*
   A bill is not multifarious because it prays, in the alternative, for a final settlement of an estate, if it be found practicable; or, if not, for a partial distribution of the same.

2. SAME.   *Bill for final settlement.   Demurrer.*
   A bill seeking the final settlement of an estate is not demurrable because it shows that there are debts to the estate not due and uncollected, where it charges that the executor has converted all of the assets to his own use, has failed for three years to return an inventory or annual account, has refused to make partial distribution of money in his hands, and has made false, contradictory, and evasive statements to the legatees, of the condition of the estate, with the fraudulent design of forcing them to sell their interests to him. These facts, if established, would justify the court in charging the executor with the entire estate, whether collected or not, and in decreeing a final settlement thereof.

3. SAME.   *Bill against an executor.   Who proper parties.*
   In a bill to compel the settlement of an estate, and to charge the executor with a note which he refuses to collect, the makers of the note are proper parties defendant, where, being the daughters of the testator, they claim that the note was not given as evidencing a debt, but merely as evidencing an advancement to them by their father.

4. SAME.   *Claim against a decedent.   Who incompetent to prove.*
   In a cause where it is sought to charge an executor with the amount of a note given by his deceased wife to his testator for the land of which he is tenant by the curtesy, he is incompetent to testify, as a witness, to anything in reference to the note occurring in the life-time of the testator, and tending to defeat the collection of the note; and such incompetency is not affected by the fact that the deceased wife was legally incapable of executing the note, if the executor holds the land and refuses to pay the note.

5. EXECUTOR.   *When liable for compound interest.*
   Where an executor mingles the assets of the testator's estate with his own money, and uses the same for his own purposes, he should be charged by the court with compound interest at six per cent per annum on such assets. But he should not, in such a case, be denied his commissions for managing the estate.

6. SAME.   *Railroad stocks of the estate.   Depreciation by management of executor.*
   Where an executor, by an honest mistake in judgment, has failed to sell railroad stocks belonging to the estate in his charge till they have greatly depreciated in value, he should not, for such mistake, be charged with the highest market price of the stocks at any time while in his hands.

APPEAL, and CROSS-APPEAL, from the Chancery Court of Monroe County.

Hon. L. HOUGHTON, Chancellor.

The appellees, who are residuary legatees under the will of Stephen S. Ewing, deceased, exhibited their bill of complaint against W. W. Troup and Thomas Ewing, the executors, Susan Troup, a daughter of the testator and present wife of W. W. Troup, the children of Mary Troup, deceased, formerly the wife of W. W. Troup and daughter of the testator, and others, residuary legatees who did not join in the bill. The executors are charged with having received, amongst the assets belonging to the estate of the testator, the promissory note of Mary Troup and Susan Ewing for $10,000, which the latter, now Susan Troup, and the heirs of Mary Troup claim as evidencing a gift or advancement to them of that amount. It was also charged in the bill, and admitted by Troup, that he received certain railroad stocks, as executor, which he had retained till they were greatly reduced in price; but he states that he held the stock by an honest mistake in judgment as to the best interests of the estate. It is also alleged that Troup had converted the assets of the estate to his own use, and had rendered no inventory of the assets or account of his management of the estate, although more than three years had elapsed since he became executor.

The prayer of the bill was that, upon final hearing, the executors be charged with all moneys and other assets that have, or may, come into their hands; that on the money they be charged with compound interest at ten per cent; that they be charged with the personal property and other assets that have been lost, converted, used, or injured by them, or that may have depreciated in their hands; that, if the estate be found in a condition for final settlement, the same be required by the executors; if not, that a partial distribution on refunding bonds be ordered; and for such other and further relief as may be equitable.

The will of Stephen S. Ewing refers to the $10,000 note of

Mary Troup and Susan Troup, as follows: " The balance of my estate which consists at present in debts moneys and railroad stocks which is to be equally divided between my children except Mary Troup and Sue Troup who have already received more than their shares after paying me the ten thousand dollars which they gave me their joint note for the land which is recorded and will show the transaction more fully they are not to have any more of my estate now on hand."

A demurrer to the bill was filed, the grounds of which appear in the opinion of the court. It was overruled, and the defendants answered. Upon final hearing, a decree was rendered, from which the parties on both sides appealed. The respective assignments of errors sufficiently appear in the opinion of the court.

*Murphy, Sykes & Bristow,* for the appellants and cross-appellees.

1. The amended bill is badly multifarious as to its purposes or objects.

The right of a legatee or distributee to a partial distribution after twelve months, upon his executing a refunding bond, on the one hand, under section 1175, and to a final settlement and distribution of the entire estate, under sections 1166, 1167, on the other hand, are altogether distinct from, and independent of, each other. In a proceeding having the latter object in view, the legatee or distributee must show, as conditions precedent, that there are no debts unpaid, no dues uncollected, nor property unsold — if required to be sold — and no litigation pending *pro* or *con.* In addition to these, it may be shown that the executor is guilty of malversation in office, and has wasted, or is fraudulently converting, the whole estate ; and this last, in a direct proceeding for that purpose, on special notice to him, under section 1122, will authorize his removal, and a consequent " settlement with the court so far as he may have administered the estate."

On the other hand, in a proceeding under section 1175, the legatee directly waives all the foregoing conditions, and

founds his petition alone upon the ground that twelve months. have elapsed, and he tenders a refunding bond. If this: ground be lacking, no amount of neglect or malversation charged will retain the petition. It will be demurrable. If, however, the lapse of twelve months be shown, the introduc- tion of the other allegations will not even strengthen the case. The petitioner will be entitled to the relief absolutely, as a matter of right. *Crowder* v. *Shackleford*, 35 Miss. 354.

The respective bases for the two kinds of relief provided, being thus distinct from, and independent of, each other, are not mutually convertible — therefore they are incompatible ; and, hence, in a bill brought under section 1175, alone, they would be multifarious. The less cannot include, but waives: and excludes, the greater.

2. The amended bill is inexcusably multifarious as to its: parties defendant.

Whether the amended bill be regarded as one for a final settlement of the estate, or of Troup's administration of it, under sections 1122, 1166, 1167, 1170, or for a partial distri- bution on refunding bonds, under section 1175 — what possible legal interest has Mrs. Susan Troup in the litigation? She is. expressly charged in the amended bill, and the will sustains the charge, as having no part or lot in the estate, the whole of which is diposed of to others by the will. She is expressly charged in the amended bill to be only a debtor to the testator by her promissory note for lands sold her by him ; and no col- lusion is alleged between herself and the executors.

The case would be different if collusion between the debtor· and executor were charged, or if the latter were stated to be- insolvent. See, expressly in point, Story's Eq. Pl., secs. 178, 227, 274, 514 ; *Long* v. *Majestie*, 1 Johns. Ch. 305 ; *Pearse* v. *Hewitt*, 7 Sim. 471 ; 10 Eng. Ch. Rep. 152.

If we are right in saying Mrs. Susan Troup has no interest: in this suit, and is improperly here, what shall be said of the· five infant children of the other disinherited daughter, the· deceased Mary Troup? What interest have they? Or what

liability to anybody, in law or equity, rests upon them? They are neither legatees, debtors, nor the representatives of such.

3. We earnestly insist that a proper construction of the will itself shows that the testator originally intended the $10,000 note as an advancement jointly to his two daughters — or, rather, he intended the land as such advancement, valued at its date at $10,000, although at the later date of the will he evidently regarded it as really then worth more than that sum, and, therefore, that they had thereby " already received more than their share."

(1.) The conveyance is referred to by the testator as a " trans-action " which materially influenced the estimate of the amount of " their shares " of his estate " already received " by the two daughters. This it could not do if it were a mere bargain and sale.— a transaction between vendor and vendees, as claimed by the bill.

His language is :   *   *   *   " To be equally divided be-tween my children, except Mary Troup and Sue Troup [the former then dead, and, therefore, evidently mentioned as the head of one set of his descendants], who have already received more than their shares, after paying me the $10,000, [for] which they gave me their joint note for the land [and the deed to] which is recorded, and will show the transaction more fully." Now, " already received " certainly refers to the past transaction concerning the land, and which the deed would " show more fully." If this be true, the transaction could not have been one of mere bargain and sale, for, in that event, Mary and Susan Troup did not receive anything as an advance-ment. They paid for what they got. "Who have already re-ceived more than their share, after paying me the $10,000," -etc. The words " paying me " here manifestly mean ac-counting (for). How else could it increase their receipts or debits to more than their shares? If they had already received more than their shares, independently of this transaction, the effect of their paying out $10,000 would rather operate to

diminish their shares by $10,000 below an equal proportion. The "paying" mentioned, as understood and used by the testator himself, was to be such an act as "after" and by reason of which their receipts would exceed their equal shares. Then it must be accounting for.

The true interpretation of the sentence is that when they shall have been charged with the land, as advanced to them, at $10,000 fixed value, they still have received more than their shares. Immediately following the above sentence, and showing conclusively it was intended as a testamentary confirmation of a former advancement, is this one, to wit: "They are not to have any more of my estate now on hand." Now, the sentence first above considered, after the words "Mary Troup and Sue Troup," and ending with "will show the transaction more fully," must be construed to have some meaning. And if it is not to mean that those daughters, by the aforesaid transaction, had taken some of his estate, why did the testator employ, and so grossly misuse, the word "more," directly after? "They are not to have any more of my estate." He had plainly expressed already what the residuum of his estate at present consisted of — viz., "debts, money, and railroad stocks;" he then proceeds to explain what disposition he had previously made of "the land," whereby Mary and Susan had "already received more than their shares;" and he then concludes as a consequence, "they are not to have any more of my estate now on hand." That is, plainly, they are not to share in the debts, money, and stocks, after having been over-provided for with the land.

The residuary paragraph of the will assuredly contains two full sentences. If divided as we have just considered it, the period is placed after the words "transactions more fully." Now, suppose it is changed, and, according to the only other programme of punctuation, the period be placed after the words "more than their shares;" the second sentence will then read thus, viz.: "After paying me the $10,000 [for which] they gave me their joint note for the land [the deed

to] which is recorded and will show the transaction more
fully, they are not to have any more of my estate now on
hand." The result will inevitably be the same in effect.
Those influential and qualifying words, " after paying me the
$10,000," etc., will as completely control and limit the exclu-
sion of the two daughters in the remainder of the sentence
as, under the other division of the paragraph, they would limit
and qualify the pretermitting of the same two daughters in
the bequest.

Read it in the sense claimed by the bill : "After paying me
the $10,000," etc., " they are not to have any more," etc. This
is folly ; for paying $10,000 would not be having anything to
which the words " any more" could attach. But read it as
we contend — " after accounting to me for the $10,000," etc.,
" they are not to have any more "— and it will make plain
sense.

We repeat, it is evident the testator intended the land of
the estate as an advancement to Mary and Susan, jointly (both
being successively members of the same family) ; that he
intentionally valued the advancement at $10,000, a moderate,
or even a low, valuation (but whether it was valued thus under
the influence of the condition of the country at that date, or
because he desires to thus favor these children, does not
appear on the face of the will, and is not here material) ;
that he took their joint note (void as to one of them) as a
mode of fixing and debiting them with that valuation, and
that he regarded that valuation as a liberal one to them, and,
therefore, referred to it as an explanation of how they had
" already received more than their shares." No other hy-
pothesis can be consistent and rational, grammatically and
logically.

In this connection it is worthy of emphatic remark that the
testator employs the definite article " the " in mentioning the
land, and in juxtaposition with the previous paragraph, in
which he had just defined what his estate at present consisted
of: " The $10,000 for which they gave me their joint note for

the land," etc. Had he only meant (as the bill claims) to needlessly disclose his daughters' indebtedness, and its consideration as such, he would have simply said, " for land," or " for my land." But he manifestly had before his mind the material then and recently constituting the " estate " divided among his children, by advancement and bequest; and so, having said that his estate " at present " consists in debts, money, and railroad stocks, and after bequeathing that to all, except Mary and Susan, he proceeds to explain their exclusion by showing, with some pains, the disposition he had already made in their favor, of " the land " of the estate.

(2.) At the date of the will one of the daughters, Mary, was then dead. If the deed were one of mere bargain and sale, neither she nor her heirs were entitled to any of the land which had then survived in joint tenancy to her sister. She never was bound by the note as a mere business paper, even when living; and she, therefore, could not have been looked to to " pay " the same, except by her heirs accounting for it as an assumed value of an advancement of land. All this the testator knew.

(3.) After excepting Mary and Susan from the residuary bequest of his present estate, because they had " already received more than their shares," he refers, by way of explanation, to the deed, " which will show the transaction more fully." Why that, if the transaction was a mere sale, and the $10,000 note a mere debt? It would, in that event, need no explanation. The faces of the papers would explain themselves.

If Mary and Susan were only general debtors, as the bill insists, why refer to their debts in the will, more than to any other debt? Why should he there gratuitously add insult to injury, by first cutting them off and then taunting them on record with their indebtedness, and requiring its payment?

If they were mere debtors, they were no more nor less such than Clopton, Brickell, Drake, and others, some of whom owed more than they, and in gold at that; and yet those are not mentioned, while the debt of the disinherited daughters

(and one of them recently dead) is unfeelingly paraded along the face of the entire paragraph.

4. An incidental question arises as to the competency of W. W. Troup as a witness for his wife on the question of the $10,000 note.

Three questions are here involved: (1) Has Troup any interest in the result of the contest over the construction of this clause of the will? (2) Did that interest originate during the life-time of decedent? And (3) is he introduced as a witness to support that interest? The counsel below, in argument, suggested only one kind of interest, viz., that Troup was tenant by curtesy of Mary's land, and therefore interested in showing that the note was not a debt and a lien upon it.

But the note is void as to Mary Troup, a married woman; and a void note cannot operate a lien or incumbrance on anything. And we think it plainly appears from the deed itself, and from the relationship of the parties, etc., that the estate conveyed was in joint tenancy, with survivorship to Susan Troup, and not in common.

But the chancellor, in rendering his decision, suggested another possible interest in Troup, viz., that he was liable to be charged with the amount of the note and interest, as assets in his hands, and was thus interested in showing the note not to be a valid debt. This is much more plausible than the interest suggested by counsel, but we think not better founded. If Troup is charged with the note, he certainly holds it, well secured by vendor's lien, against the maker, and his interest is thus balanced. Complainants cannot say it is barred by limitation, because since October, 1871, they have been prosecuting this suit against the makers, to charge them with the same note, and, in the next place, they cannot plead for Mrs. Susan Troup the statute of limitations, which, like bankruptcy, is a personal privilege.

But, granting the interest in Troup, did it arise during the life-time of decedent, or did it originate after his death, in the

course of administering the estate? The question answers. itself. There was never a shadow of a claim against Troup during Ewing's life-time, nor until long after his death, when, in the course of administering the estate, he became, as is. claimed, liable by laches for the note in her hands.

The policy of our statute is to remove all disability on account of interest, and the exceptions will not be extended beyond the plain meaning of the statute. Code 1871, sec. 758. *Witherspoon* v. *Blewitt*, 47 Miss. 570.

But Troup, it will be seen, is not a witness for himself at all. His testimony is expressly stated to be in behalf of Mrs. Susan Troup, on the issue made by her answer to the bill of complaint and her cross-bill, and complainants' answer thereto. Now, citing the language of this court in *Sweatman, Exr.*, v. *Parker*, 49 Miss. 31, " the witness was introduced, not to establish his own claim against the estate of the deceased" [nor to defend a claim of the estate against himself], but to establish another separate and distinct claim of another person. " And although the witness may be incidentally benefited by the result of the suit, yet his testimony is not for the purpose of establishing his claim against the estate of the deceased, and, therefore, does not fall within the terms or meaning of the statute."

But we submit the late case of *Barry* v. *Sturdivant*, 53 Miss. 490, is conclusive on this point. In that case the wife, an executrix, was introduced to testify in support of the correctness of her husband's claim against her testator, which she had paid off.

5. If, under such circumstances as are presented in this case, it is to be held by the courts that executors are to be made liable, on slight technicalities or vague surmises, to the penalties of compound interest, etc., then none but an idiot, would ever accept such a position. *Gould* v. *Haynes*, 19 Ala. 459–461; *Hatcher's Administrator* v. *Clifton*, 33 Ala. 301; *Binion* v. *Miller*, *Admr.*, 27 Geo. 81, *omnes ut supra.*

A trustee will not be charged with even simple interest at.

legal rates, unless he retains balances in his hands which he ought to have invested, or mingles the money with his own, or uses it in his private business, or neglects to settle his accounts for a long time, or to pay over the money when he ought to do so, etc. Perry on Tr. 428. To justify the compounding of interest, there must be a willful breach of duty — a *crassa negligentia* — and not simple neglect or laches. There must be some special and peculiar circumstances. *Ib.* 432. The trustee must have received some credit or profit from the act. *Ib.* 429. There must be some element of breach of duty or breach of trust. *Rapelje* v. *Hall,* 1 Saund. 399.

6. As regards the delay in selling the 437 shares of Memphis & Charleston Railroad stock, we need say but a word. The proof on this point is overwhelming. It shows that Troup would have sold when the stock was at its highest, but deferred to, and acted under, the advice of the best business men in the country. The depositions of Cunningham, Wicks, Garth, Beirne, and Rison show that the best informed men in the country, thoroughly conversant with the railroad and its resources, acted as Troup did, and they yet defend their conduct as prudent under the circumstances.

If the executor is charged with the highest value of these stocks, under these circumstances, no mere error in judgment can ever escape, and every executor should be gifted with prescience before he undertakes so perilous a trust.

7. Complainants ask that Troup be required to pay all the costs out of his own pocket, and that the fees of complainants' counsel be paid out of the estate, and that the executor be not allowed any counsel fees.

We submit that under this petition for partial distribution nothing of this kind can be adjudicated. Whenever, in any account, either annual or final, the executor shall ask allowance for any disbursement to which he is not legally entitled, then will be time enough to contest it. We will then show that in any litigation over the construction of a will an executor is entitled to his counsel fees out of the estate.

As for the fees of complainants' counsel: This suit is an individual suit of complainants, for their own benefit, and has no more to do with the estate than an action of debt against an executor. They must, therefore, select their own counsel, make their own bargain with him, and pay him out of their own pockets.

*Harris & George*, on the same side, filed an elaborate brief.

*W. P. Harris* and *E. H. Bristow*, on the same side, argued the case orally.

*Houston & Reynolds* and *Josiah Patterson*, for the appellees, and cross-appellants.

1. Under the facts stated in the bill, complainants are entitled to a decree for a final settlement of the estate.

Any executor who converts the assets of an estate to his own use and purpose, or mingles the same with his own, or trades or speculates with them, is accountable to the legatees for the assets as cash, and they may charge him with the value of the assets thus misapplied, and compel a final settlement of the estate. To state the proposition in another form, the final settlement of an estate will be decreed when an executor, by his fraud or neglect, has rendered himself chargeable with the assets of the estate. *Cole* v. *Leak*, 27 Miss. 768–772 ; *Allison* v. *Abrams*, 40 Miss. 748 ; *Coffin* v. *Bramlett*, 42 Miss. 194.

2. But if, as is contended by appellants' counsel, nothing else but the incidental relief of partial distribution on refunding bonds can be granted, and all the other charges and prayers in the bill are wholly useless and superfluous, this does not make the bill obnoxious to a general demurrer. In such a case the defendants should have answered the bill and demurred specially to the prayer for a final settlement.

The *gravamen* of this objection is that, while complainants, under the allegations of the bill, are entitled to a decree for final distribution, they have made averments which are superfluous. Not that we have said too little, but that we are to be condemned for our much speaking. If this be true, the bill is not demurrable, but on reference to, and report of, a master,

it would be stripped of its superfluity, and the party or his counsel taxed with costs. Impertinence is not in itself prejudicial to any one; it is but a naked superfluity. Story's Eq. Pl. 266–270.

. 3. It is next objected that the bill is multifarious, both as to its parties and subject-matter. Mrs. Susan Troup and the children of Mary Troup are not made parties defendant as debtors of the estate, but as legatees claiming an interest in its assets, and in the construction of the will of Ewing.

The bill contains this statement, in substance: That a note for $10,000, made August 1, 1865, by Mary Troup and Susan Ewing, and due one day after date, and payable to the testator, S. S. Ewing, came into the hands of the executors, as assets of the estate; that the consideration of this note was the purchase of certain tracts of land; that Susan Troup and the children of Mary Troup claim the note as a gift, bequest, advancement, or some other interest therein, under the will of Stephen S. Ewing.

The purpose of the bill being a partial distribution or final settlement of the estate, and in that settlement or distribution to charge the executors with the note for $10,000, it was not only proper, but it would have been erroneous not to have joined parties who claimed the note as a gift or advancement under the will. No decree could have been rendered which would have concluded the two Mrs. Troups without joining them as parties. They were joined, not as debtors, but as legatees claiming an interest. But if Mrs. Susan Troup and the infant children of Mrs. Mary Troup have no interest in the suit, and are improperly made parties, the bill as to them, and them alone, is demurrable, not for multifariousness, but for their misjoinder as defendants. Story's Eq. Pl. 541, 544, 271 a, note 3.

It is urged that in the same bill, and on the same state of facts, complainants cannot ask for a final settlement of the entire estate, but, failing in that, demand a partial distribution on refunding bonds. As these purposes, final settlement and

partial distribution, are " in the same range of projection," we may aim our bill at the one furthest off, but, missing that, may hit the nearer.

A bill is not multifarious which contains several matters all of which may come into consideration as prayed for, although relief may be ultimately given in respect to some of them only. Story's Eq. Pl. 278 *a; Addison* v. *Walker*, 3 You. & Coll. 444. To render a bill multifarious, the matters thereof must not only be separate and distinct, but each must be of a character entitling complainant to a separate, independent, equitable relief. *Pleasants* v. *Glasscock*, Freem. Ch. 24; *Vauter* v. *Smith*, 5 Paige, 137–160; *Brady* v. *McCusher*, 1 Comst. 214; *Bledsoe* v. *Monroe*, 5 Ired. 313.

4. We contend that the note is what it purports to be : a promise in writing to pay on a day named a certain sum of money. That the clause in the will means what it says : that Mary Troup and Susan Troup, who have received more than their shares, after paying the $10,000 note, are not to participate in the residuum of the estate.

Wills are required to be in writing. The intention of the testator is to be gathered from the writing. The law presumes that the testator has said everything he intended to say, and that he has said nothing he did not intend. As a corollary from this, follows the well-established legal principle that parol evidence is not competent to supply, contradict, enlarge, or vary the words of a will, or to explain the intention of the testator. To this principle there are two exceptions : first, where there is a latent ambiguity arising *dehors* the will, as to the person or subject-matter intended to be designated or described ; second, to rebut a resulting trust. *Mann* v. *Mann*, 1 Johns. Ch. 233; 1 Jar. on Wills, 343, 350–353; 2 Ph. on Ev. 256; 4 *ib.* 529; *Love* v. *Buchanan*, 40 Miss. 760.

The rule excludes the declaration of the testator as to his intention, or as to his construction of the will, made either before, or at the time, or after the making of the will. Under the operation of these legal principles the testimony of those

witnesses who give declarations made by the testator, or detail conversations had with him, are incompetent, and should have been excluded.

It is a familiar rule of construction that the plain and unambiguous words of the will must prevail, and are not to be controlled by any construction growing out of the situation, circumstances, or conditions of the testator or his family. 2 Ph. on Ev. 350; *Coney* v. *Murphy*, 35 Miss. 473; 18 Miss. 460. When the will is explicit, either the one way or the other, there is no room for the admission of extrinsic evidence. *Gilliam* v. *Chancellor*, 43 Miss. 353. When the contemporaneous facts, or facts *dehors* the will, are inconsistent with the purpose and meaning of the words employed, they cannot be invoked to vary or contradict the interpretation of the language used. *Tucker* v. *Seamen's Aid Society*, 7 Metc. 209.

5. It is assigned for error that the court excluded the testimony of W. W. Troup. Troup's testimony tends to establish his own claim or defense against the estate of Ewing, in a transaction originating in the life-time of Ewing; and under the statute, for such a purpose, he was not a competent witness.

The note of Mary Troup was a charge on her interest in the land purchased. Troup, her husband, on her death, became a tenant by the curtesy. Any testimony from Troup tending to show that the note was not a charge on the land — that it was a mere gift, or the evidence of an advancement — established a defense that affected his interest in the land. Though the conveyance to Mary and Susan Troup created a joint tenancy at common law, with the right of survivorship, under our statute it was a tenancy in common. To the extent of the interest of the wife, at her death Troup became tenant by the curtesy. *Markham* v. *Merritt*, 7 How. 437; *Woolridge* v. *Willson*, 3 How. 360.

6. The will requires that the executor shall convert all the assets of the estate into cash and distribute it, paying the distributees greenbacks. No period of time is fixed by the will in which this is to be done. The law requires that, at the ex-

piration of twelve months, executors, etc., shall be ready to distribute; and, as a corollary from this, he must proceed within this time to convert the estate susceptible of such conversion, and not required to be divided in kind into money. The Memphis & Charleston Railroad stock came into the hands of Troup, executor, on December 12, 1867. No effort was made by the executor to dispose of it until January, 1872. At the time it was received it was worth about 50 cents on the dollar, and has gradually declined since to 10 cents.

If it were the duty of the executor to sell the stock within a reasonable time, and loss has fallen on the estate because of his neglect in so doing, it is plain that he should be charged with the market price of the stock at the time he should have sold it. The fact that business men of prudence and caution held their stock, and that it depreciated on their hands, is no excuse for an executor. It is his duty to convert into cash, and not speculate for the estate on the advance or decline of securities. We here comment, in passing, that the testimony shows that there was a difference of opinion among Memphis business men as to the future of this Memphis & Charleston Railroad stock. In this conflict of opinion, if the executor exercised his own judgment, and a loss ensued, he is liable. He could have saved himself from the hazard by a decree of the court directing him either to sell or to hold. 2 Spence's Eq. 932; Hill on Tr. 581.

7. Is the executor, Troup, liable for interest? and, if so, at what rate? The rule on this subject is thus stated by a late author:

" If a trustee retains balances in his hands which he ought to have invested, or delays for an unreasonable time to invest, or if he mingles the money with his own, or uses it in his private business, or deposits it in bank in his own name, or neglects to settle his account for a long time, or to distribute or to pay over the money when he ought to do so, he will be liable to pay simple interest, at the rate established by law." Perry on Tr., sec. 468; *Anderson* v. *Gregg*, 44 Miss. 182;

*Brandon* v. *Hoggath*, 32 Miss. 340; *Kerr* v. *Lord*, 27 Miss. 551.

When a trustee has been guilty of maladministration or fraud, or has used the money and refuses or fails to account for the profits, he may be charged with compound interest. The *onus probandi* is upon the trustee to show what the profits are; and, if he fails to do it, the law will presume that he made profits equal to compound interest. *Utica Ins. Co.* v. *Lynch*, 11 Paige, 520; *Montjoy and Wife* v. *Lushbrook*, 2 B. Mon. 261; *Scheiffelin* v. *Stewart*, 1 Johns. Ch. 620; *Crowder* v. *Shackleford*, 35 Miss. 360.

A trustee who uses the trust fund should be charged with the highest rate of interest known to the law. *Powell* v. *Cooper*, 42 Miss. 226.

8. The executor of Troup should not be allowed commissions. We have already commented upon the improper conduct of the executor. The law fully sustains us in asking that he be denied all commissions. *Barney* v. *Saunders*, 16 How. 535; 24 Penn. 232; *Cooper* v. *Powell*, 42 Miss. 220; 35 Miss. 321; 24 Miss. 412; 32 Miss. 335; 27 Miss. 551.

9. The executor, Troup, is not entitled to credit for fees paid attorneys in defending this suit. The interests of Mary Troup and the children of Mary Troup are antagonistic to the legatees, who claim the residuum of the estate, and counsel fees for this litigation should not be imposed upon the estate, but upon the parties to be benefited by it. Counsel fees paid by Troup in defending the suit brought to compel a settlement by him, and to charge him with his neglect and misconduct, are not a charge on the estate, but Troup's individual matter. 32 Miss. 335, 341; 37 Miss. 106, 108; 13 Smed. & M. 303.

*R. O. Reynolds*, on the same side, made an oral argument.

CHALMERS, J., delivered the opinion of the court.

The primary object of the bill was to force a final settlement, and, as a necessary part of such settlement, to make the executor liable for the $10,000 note executed by his first and

second wife, as part of the assets of the estate. There was added a prayer for partial distribution, in case a final settlement should be found impossible. There was nothing inconsistent in these prayers, nor was the bill thereby rendered demurrable. Neither was it demurrable as a bill for final settlement, though it showed upon its face that some of the notes due the estate were uncollected, and one of them not due.

It charged that the executor had converted the entire estate to his own use; had embarked its assets in his private business; had failed for three years to return an inventory or annual account; had refused to make partial distribution of the large amount of money in his hands; and had made false, contradictory, and evasive statements to the legatees, of the condition of the estate, with the fraudulent design and purpose of forcing them to sell their interest to himself. Facts like these, if established, would justify the court in charging him with the entire assets of the estate, whether collected or not, and in decreeing a final settlement on that basis. *Cole* v. *Lake*, 27 Miss. 768; *Allison* v. *Abrams*, 40 Miss. 748.

Neither was the bill demurrable for improper joinder of parties by reason of the makers of the $10,000 note being made defendants. They were not necessary — but neither were they improper — parties.

The bill charged that said note constituted a part of the assets of the estate, but averred that the makers of it, who were daughters of the testator, and successively wives of the executor, claimed that it had been given only as evidencing an advancement made by the testator in his life-time, and that it was not intended to be obligatory, as imposing a debt upon the signers. Complainants charged that the last will and testament of the testator negatived the theory of an advancement, but that the makers of the note and the executors claimed that the will supported such theory. Seeking, as the bill did, to charge the note as assets of the estate against the executor, and thereby involving a construction of the will, it was not improper to join the makers of the note as defendants. They

do not stand upon the footing of ordinary debtors. If the executor was to be charged with the note, it was well for him that the makers of it should be joined. as parties, so that the decision might be binding upon them. The demurrers were properly overruled.

The executor was incompetent, as a witness, to detail anything occurring between himself and the testator in the lifetime of the latter. He was tenant by the curtesy of his deceased wife (one of the makers of the note) in the lands for which the note had been executed, and thereby directly interested in defeating its collection. Whether his wife had the legal capacity to execute the note or not, he could not hold the lands and refuse to pay it. The attempt by the bill was to charge him personally with this note as assets which he had failed and refused to collect. He avers in his answer his willingness to pay it if it be held to be assets. Manifestly, then, he is an interested, and therefore incompetent, witness to show its invalidity, by testifying to matters occurring in the life-time of the testator. He was competent to testify in relation to the grave charges of fraud preferred against him by the bill, and supported by the testimony of his co-executor, but he failed to allude to them in his deposition.

We think that the language of the will, in relation to the $10,000 note, is too plain to admit of construction. It is awkwardly and ungrammatically expressed, and the sentence is written without punctuation marks, but it explicitly declares that the note is to be paid, and that the makers of it shall receive no part of the estate, because, even after they have paid it, they will have received more than their share, by reason of the excess of value of the property, for which the note was executed, over the price to be paid. No punctuation marks, nor construction, can make the will speak any other meaning. To make it mean other than this is not to construe, but to destroy, the language. Neither does a careful consideration of all the competent proof taken with a view of throwing light upon the will satisfy us that the testator in-

tended to convey a different meaning. Undoubtedly he was anxious to provide for his youngest daughter, Susan, but he could not have intended to make her fully equal with the other children, charging the others in full with what they had theretofore received in slaves, because, by the same deed, an equal amount of property was conveyed to Mary and to Susan whereas the former had previously been advanced $12,000 or $15,000 in excess of the latter. We think that the weight of the evidence points to the conclusion that the testator, who is shown to have been anxious to make provision for his youngest daughter, Susan, thought that, having a short time before given her cotton to the amount of $5,300, he satis-factorily accomplished his design in selling to her, for $5,000, a half-interest in a plantation worth $25,000, exclusive of the personal property given with it. Certainly this accords with the language of the will.

We think that no injustice, in any respect, was done the executor by the decree below.

The cross-appeal presents for review the action of the court below in the allowance of commissions to the executor, the failure to hold him accountable for interest, and to charge him with the highest market value of certain railroad stock which he had permitted to depreciate upon his hands, and the allow-ance to him of fees paid attorneys. It is insisted that there was proof of such fraudulent conduct on the part of the executor as should have deprived him of all commissions, and subjected him to compound interest at the highest legal rate. The charges of fraud contained in the unsworn bill, and denied by the sworn answer, are sustained only by a single witness. They cannot, therefore, be said to have been established.

While we do not think he should have been denied commis-sions, we think that he should have been charged with com-pound interest — that is to say, interest at six per cent, with annual rests, on all cash balances from the date of their accrual, excluding the $24,000, which he is shown to have set apart and kept separate. The balance of the assets he mingled with

and used as his own, and so far from its being true, as claimed
by him, that he always had money on hand sufficient to respond
to all possible demands, it is shown that he was frequently
over-checked in bank and with his commission merchants.    It
is shown, also, that during his executorship he has bought six
plantations or tracts of land, aggregating more than $30,000
in the prices paid.    The circumstances raise the strong pre-
sumption that they were bought, in part at least, with money
of the estate, or with the profits which that money enabled
him to make in his business, and bring him fully within the
rule announced in *Crowder* v. *Shackleford*, 35 Miss. 324 :
" Where a trustee uses the trust fund for his own benefit, and
has made, or there is ground to infer that he has made, a profit,
the *cestui que trust* may elect to take the profits, or the princi-
pal with compound interest."

There is no denial here that the executor used the funds of
the estate as his own.    The grounds for believing that he has
made a profit by so doing are at least as strong as in the
case of *Crowder* v. *Shackleford, supra.*

The refusal to charge him with the highest market price for
the railroad stock was correct.  He retained it under an honest
mistake of judgment, shared in by many men of experience
and prudence.

With regard to the lawyer's fees, we are left in doubt as to
the nature of the services for which they were paid.    The
executor should be allowed credit for those only properly paid
in prosecuting or defending suits by or against the estate, ex-
cepting those paid in this litigation.

Decree reversed at executor's cost, and cause remanded, with
instructions that the account be restated in accordance with
the views here announced.